UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X
UNITED STATES OF AMERICA,          :
                                   :
          - against -             :
                                   :
JUAN MEDINA,                       :
                                   :          **OPINION**
               Defendant.          :
------------------------------X    02 Cr. 1082 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

On January 23, 2004, Juan Medina ("Medina") appealed from a
judgment of this Court sentencing him to 240 months in custody,
a three-year term of supervised release and a $100 special
assessment.    On September 14, 2005, the Government filed a
motion with the Second Circuit requesting a remand for the
limited purpose of conducting an evidentiary hearing concerning
Medina's   claim   that   his   former   attorney,   Jon   Silveri
("Silveri"),  coerced  or  misled  him  into  pleading  guilty.    The
Second Circuit granted the Government's motion conditioned upon
the consent of Medina's appellate counsel which was subsequently
given in an affirmation dated December 15, 2005.

Accordingly,  this  Court  held  evidentiary  hearings  on  May
11, 2006 and June 6, 2006, receiving testimony from Medina and
two  attorneys  who  advised  him  in  advance  of  the  plea,  Silveri
and  Benjamin  Heinrich  ("Heinrich").    For  the  reasons  explained
below,  this  Court  has  concluded  that  Medina's  allegations  that

defense counsel coerced and misled him into pleading guilty are entirely without merit.

## BACKGROUND

### Superseding Information and Plea

On October 1, 2003, Medina pled guilty to a one-count superseding information which charged him with participating in an enterprise called the Manzueta Organization through the commission of two Hobbs Act robberies in violation of the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1962(c). <u>See</u> S17 02 Cr. 1082 (NRB)("Information"). The Manzueta Organization "executed numerous coordinated, carefully planned home invasion robberies, primarily of narcotics traffickers in the New York metropolitan area." <u>See id.</u> at ¶ 3. Racketeering Act One specifically charged Medina and others with robbing the occupants of an apartment near Allerton and Holland Avenues in the Bronx in 2001. <u>See id.</u> at ¶ 12. Racketeering Act Two charged Medina and others with conspiring to rob the occupants of an apartment in the vicinity of Hillside Avenue in the Bronx. <u>See id.</u> at ¶ 13. During both robberies, Medina apparently served as a lookout while some of his co-defendants were inside the apartment buildings. <u>See</u> Tr. of 10/1/03 Conf. at 12-13.

Under the terms of the plea agreement, the parties stipulated that the total offense level was 39 and that Medina belonged in Criminal History Category I under the United States Sentencing Guidelines ("Guidelines"). See Gov't Ex. 3, Plea Agreement at 2-3. This resulted in an initial sentencing range under the Guidelines of 262 to 327 months in custody. Id. at 3. However, because the statutory maximum for the charged offense was 240 months, the parties stipulated to a sentence of 240 months. Id. Medina also agreed that he would not "file a direct appeal, nor litigate under Title 28, United States Code, Section 2255 and/or Section 2241, [any sentence] at or below the Stipulated Sentence of 240 months." Id. at 5.

At the beginning of the plea proceeding held on October 1, 2003, Medina was placed under oath. See Tr. of 10/1/03 Conf. at 2. Consistent with the requirements of Rule 11 of the Federal Rules of Criminal Procedure, this Court then conducted an extended allocution before accepting Medina's plea of guilty. Among other things, Medina confirmed that the plea agreement had been translated for him and that he had a sufficient opportunity to discuss it with Silveri before he signed it. Id. at 4, 9-10. Medina also confirmed that he was satisfied with the advice he had received from Silveri. Id. at 4.

During the conference, this Court also asked certain questions to ensure that no threats or promises outside of the

plea agreement induced Medina to enter a plea of guilty, as demonstrated by the following exchange:

> **Court:** Now, for a moment, let's put the plea agreement to one side. Have – apart from this plea agreement, have any threats or promises been made to you to make you plead guilty?
>
> **Medina:** No ma'am.
>
> **Court:** Again, leaving the plea agreement to one side, have any understandings or promises been made to you concerning the sentence that you will receive?
>
> **Medina:** No, ma'am.
>
> **Court:** Is your plea voluntary?
>
> **Defendant:** Yes, ma'am.

Tr. of 10/1/03 Conf. at 10. Before accepting the plea, this Court reviewed the terms of the plea agreement with Medina including the fact that the stipulated sentence was twenty years and that he was waiving his right to appeal or otherwise challenge a sentence at or below twenty years. See id. at 11-12.

At the conclusion of the conference, Medina indicated that he wished to say something to this Court. Silveri stated that he knew what Medina wished to talk about and "believe[d] it's appropriate as something to be said at the sentencing, not today." Tr. of 10/1/03 Conf. at 15. This Court informed Medina that it is generally advisable to follow counsel's advice, and

Medina apparently agreed because he did not say anything further. However, this exchange did prompt the Government to state that Medina had previously expressed an interest in a cooperation agreement, but that no cooperation agreement was in place and such an agreement was not anticipated in the future. See id. at 15-16. This Court then asked Medina whether he understood that he did not have a cooperation agreement with the Government, and Medina confirmed that he understood. Id. at 16. Following this exchange, I accepted Medina's guilty plea after concluding that it was both knowing and voluntary. Id.

**November 27, 2003 Letter**

On December 1, 2003, this Court received a letter dated November 27, 2003 from Medina indicating that he was dissatisfied with Silveri and requesting permission to change counsel and withdraw his guilty plea.[1] On December 4, 2003, I

---

[1] The full text of the letter includes the following:

> I would like to change my attorney because he is not working on my case, when my family call him he do not pick up the phone, but when I tell someone else to call he answers. Your Honor the day I plead it guilty I raised my hands to you and you said to ask my attorney first and what I wanted to say was; that I want to change my private attorney. Also, I requested to his office a copy of my plea and hitherto I have not received it yet! Moreover, I need the discovery too it is very important for me. I ask him to do a motion for and he said is too late – that's his favorite word when I ask him to do something.
>
> I believe that my attorney have been lieing [sic] to me your honor; therefore, I need to take my

forwarded a copy of this letter to Silveri and requested that he meet with Medina and inform the Court in writing as to whether a conference was needed to address the issues raised. During the sentencing on January 14, 2004, this Court learned for the first time that Silveri had not received the letter. See Tr. of 1/14/04 Conf. at 5.

**Sentencing**

Medina appeared before this Court for sentencing on January 14, 2004 with Silveri and Assistant U.S. Attorney Laurie Korenbaum. At the beginning of the proceeding, Medina requested a postponement of the sentencing to allow him to change counsel. See Tr. of 1/14/04 Conf. at 2. Medina complained that Silveri had "told [him] things one way and then they had turned out to be a different way." Id. Medina then expressed his belief that Silveri failed to transmit information to the Government that would secure a cooperation agreement. Id. Evidently, Medina hoped that new counsel would somehow secure a cooperation agreement with the Government before his sentence was imposed. See id. at 2-3. Medina also complained that Silveri failed to give him a copy of the plea agreement despite numerous requests

---

plea agreement back because 20 years for what I did – for my participation on Hobb [sic] Act (a minimum participation). I would like to thank you in advance for your time.

and that he felt he was entitled to a "second opinion" on the plea agreement. See id. at 4, 10-11, 13.

Moreover, Medina alleged that Silveri lied to him prior to and during the plea conference by assuring him that there was a secret agreement with the Government outside of the written plea agreement. See Tr. of 1/14/04 Conf. at 3, 13. Specifically, Medina claimed that Silveri told him the prosecutor, Ms. Korenbaum, was "crazy for a while" and assured Medina that there was an "under the table" agreement. Id. at 3. Medina also claimed Silveri had instructed him to say that there was no agreement with the Government other than the plea agreement when this Court specifically questioned him on this point. See id. at 8-9, 18.[2] Medina additionally alleged that Silveri coerced him into signing the plea agreement by telling Medina that if he went to trial he faced a likely sentence of sixty years and that if he signed a plea agreement, the Government would later accept his cooperation and this Court would subsequently reduce his sentence. Id. at 8. Later, Medina asserted that Silveri had lied by telling him that the "rule 25 or something could be used later to get my sentence[] reduced." Id. at 10.

---

[2] Medina claimed that "[w]hen the prosecutor said there is no [cooperation] agreement, I took [Silveri] aside to say something, and I called his attention to it. He said, no, no, that's just something we have to say in front of the judge." Tr. of 1/14/04 Conf. at 8-9.

While Silveri did not directly respond to these accusations, he was also not entirely silent. During the conference, Silveri explained that he had discussed Rule 35 of the Federal Rules of Criminal Procedure with Medina and that Medina consulted with another attorney, Heinrich, before the plea conference. See Tr. of 1/14/04 Conf. at 10-11, 14. Silveri also explained that Medina's wife came to his office to pick up legal documents and that his understanding was that Medina preferred this arrangement to receiving documents by mail in prison. See id. at 13-14.

In responding to Medina's allegations, I reviewed the record of the plea conference and explained to Medina that none of his claims were sufficient to permit a withdrawal of his guilty plea in light of the statements he had made under oath at the plea conference. See id. at 5-7, 9, 15. I also concluded that postponing the sentencing was not warranted because nothing that new counsel could submit would impact the sentence imposed.[3] Id. at 6, 15.

It was, however, apparent at sentencing that Medina was very upset about the fact that he had not secured a cooperation agreement with the Government. It was also clear that he did not understand the concept of a RICO enterprise or conspiracy.

_____

[3] Medina's sentencing took place prior to the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005).

See Tr. of 1/14/04 Conf. at 3-4, 6. Quite understandably, Medina therefore had trouble accepting the fact that he faced twenty years of incarceration when his role during the robberies was limited to serving as a lookout. Id. at 3-4, 6, 17. After allowing Medina to speak at length, this Court concluded that his allegations of attorney misconduct were not credible and were asserted because Medina regretted the fact that he had entered into the plea agreement and faced a twenty-year sentence.

## EVIDENTIARY HEARINGS

### Testimony of Juan Medina

Medina was the first witness to testify during the hearing held on May 11, 2006. During direct examination by his appellate counsel, Paul Angioletti, Medina asserted for the first time that Silveri had promised him a sentence of five to six years.[4] See Tr. of 5/11/06 Conf. at 5-6. Medina claimed that Silveri persuaded him to sign the plea agreement by telling him that "the judge was not a bad person, that she was going to give [him] five to six years" and that if Medina did not sign

---

[4] As an initial matter, it defies credulity that Silveri would promise such a sentence when almost all of Medina's thirteen co-defendants pled to potential sentences of between 17 and 36 years.

"the prosecutor could get really mad and then she wouldn't help me at all with anything." Id. at 5-6.[5]

When Mr. Angioletti inquired about the "under the table" agreement Medina referenced during the plea conference, Medina appeared not to recall his prior allegation. See Tr. of 5/11/06 Conf. at 7.[6] Mr. Angioletti then asked what prompted Medina to write the November 27, 2003 letter. Medina explained that he wrote the letter because "another inmate told me, if you pled guilty to 20 years, they are tricking you because you can't sign

---

[5] During cross-examination by the Government, the following exchange took place:

> **Government:** [T]he judge also told you what the maximum penalty was at your plea, didn't she?

> **Medina:** Yes, but [Silveri] had told me that was like just to sign that, those 20 years. That she knew what she was going to give me, and she was going to give me five to six years and that's why, that's why I sign right away. Because since he was my attorney, I just listened to what he was telling me.

> **Government:** You understood that you could get up to 20 years, right?

> **Medina:** No. Because he had told me, sign this. From the very first day when I came here and the judge read me the charges, he was telling me, you're just facing five to six years.

> Tr. of 5/11/06 Conf. at 13.

[6] **Angioletti:** Mr. Medina, at the time that you were sentenced, you made reference to an agreement that was under the table. Do you remember saying that?

> **Medina:** No. Silveri told me to sign that. He didn't tell me anything about an agreement. He told me, sign this...

10

20 years for what you did.  Your attorney is cheating you, and that's why I wrote to her."  Id. at 8.

Mr. Angioletti next asked Medina whether he understood that there was no cooperation agreement with the Government at the time he entered his guilty plea.  Medina responded: "Yes, I knew there was no cooperation. I knew that."  Tr. of 5/11/06 Conf. at 9.  Medina then mentioned a letter he claimed to have received from Silveri after sentencing which allegedly contained Silveri's admission that "he knows he is guilty, he knows he didn't do his job very well, kind of.  Then in the resentencing my time could be lowered, or if he could get a Rule 35."  Id. at 9.  Medina claimed to have sent a copy of this letter to this Court.  Id.  I never received the letter described and asked Mr. Angioletti whether he had seen the letter.  Id. at 9-10.  Mr. Angioletti had not seen the letter.  Id.

During cross-examination, Medina again confirmed that he understood at the time of the plea that he did not have a cooperation agreement with the Government.  See Tr. of 5/11/06 Conf. at 16, 18.  He repeatedly acknowledged during the hearing that he was guilty of participating in the two charged robberies.  See id. at 17, 26.  For the first time, Medina also alleged that Silveri pressured him into pleading guilty by telling him that he would only represent him at trial if Medina paid a trial fee immediately.

**Government:** Did there come a time when Mr. Silveri explained to you the difference in the time you get if you went to trial versus pleading guilty?

**Medina:** When we were here, I told him that I wasn't going to sign that because it was too much time. Then I told him I was going to go to trial, and he told me, you have to give me the money right away and then we go to trial. Then if you go to trial you're going to get 40 to 60 years, but you have to give me your money right away. I was supposed to give him the money right away, and I didn't have the money.

**Government:** Are you saying that happened the day of your plea?

**Medina:** On the same day, yes.

Tr. of 5/11/06 Conf. at 21. Medina emphasized that it was this threat combined with Silveri's promise of a five to six year sentence which induced him to plead guilty. See id. at 21-22.

When the Government asked Medina when the meeting with Heinrich occurred, Medina insisted that this consultation had occurred on the date of sentencing. Id. at 22. Medina explained that he sought advice from Heinrich because he had concluded that Silveri was "cheating" him. Id. at 23-24. When the Government inquired as to whether Medina had hired Heinrich because of his concern that Silveri had not passed along information to the Government, Medina replied that "No, no, no, I was not worried about that." Id. at 24. Shortly thereafter, Medina explained that he felt he had been "cheated" by Silveri

because he did not get a cooperation agreement with the Government and had received a sentence of twenty years in custody. See id. at 26.

During re-direct, Mr. Angioletti asked Medina whether Silveri had specifically instructed him to say "yes" when the Court asked him during the plea conference whether he was satisfied with Silveri's representation. Tr. of 5/11/06 Conf. at 27. Medina answered "yes, yes." Id. However, when this Court pressed Medina on the point, his story changed as demonstrated by the following exchange:

> **Court:** [A]re you saying that Mr. Silveri said to you before you entered the plea that I was going to ask you whether you were satisfied with his representation of you and that you must answer that question yes?

> **Medina:** No, no, no.

> **Court:** Are you saying that before you pled that Mr. Silveri said to you, the judge is going to ask you whether your plea is voluntary, and when she asks you that, you must answer yes? Are you saying that Silveri said that to you?

> **Medina:** No, no, no, no.

> **Court:** Did Mr. Silveri ever tell you that you must lie in answering any of my questions?

> **Medina:** No.

> **Court:** Did he ever say to you, when she asks you about the 20-year sentence that was agreed to in the plea agreement, that you

> must lie to her and say that that was what
> you agreed to?
>
> **Medina:** No.

Tr. of 5/11/06 Conf. at 28.   In an attempt to clarify the scope of Medina's allegations, this Court asked Medina to again explain the grounds for his belief that Silveri had lied and "cheated" him.   See id. at 29-30.   Medina reiterated that the attorney misconduct he was complaining about was the false promise of a five to six year sentence and the fact that Silveri refused to go to trial, as Medina had requested, because of the trial fee.   Id. at 30.[7]

## Testimony of Jon Silveri

Following Medina's testimony, this Court heard testimony from Silveri.   Silveri confirmed that he had explained the process of negotiating a cooperation agreement to Medina during the early stages of his representation, including the potential risks and benefits of cooperating with the Government.   See Tr. of 5/11/06 Conf. at 37-38.   Silveri accompanied Medina to a proffer session with the Government on July 1, 2003.   See id. at 39, Gov't Ex. 1.   After this meeting, the Government informed Silveri that a cooperation agreement would not be an option

---

[7] In testimony that was difficult to follow, Medina also alleged during this point of the hearing that Silveri had acted improperly during an interview with Pretrial Services by accusing him of selling drugs.   See Tr. of 5/11/06 Conf. at 30-31.

because the prosecutor believed that Medina was not being entirely honest during the proffer session. Id. at 39. Medina was disappointed. Id.

Silveri and Medina met with the Government for a reverse proffer session approximately two weeks before trial. Id. at 40. During this meeting, prosecutors shared some of the evidence they intended to introduce against Medina at trial, offered Medina a plea agreement of twenty years and explained that he faced significantly more time if he was convicted at trial. Id. at 40. Silveri confirmed that the prosecutors did not discuss a cooperation agreement during the reverse proffer session and that he said nothing to Medina to suggest that a cooperation agreement was likely once the Government initially rejected the idea. Id. at 41.

Silveri testified that Medina asked him about Rule 35 of the Federal Rules of Criminal Procedure after they learned that Medina was not going to get a cooperation agreement. See Tr. of 5/11/06 Conf. at 41, 49. Silveri apparently explained to Medina that Rule 35 might be an option after sentencing, but advised Medina not to consider it when deciding "whether to plea or go to trial because you can't bank on it." Id. at 41. Silveri stated that he never promised Medina a sentencing reduction

under Rule 35.  See id. at 47.[8]  Silveri also denied making any promise concerning a sentence other than the twenty years stipulated to in the plea agreement and specifically denied discussing a sentence of five to six years with Medina.  See id. at 41-42.  However, Silveri acknowledged that he had informed Medina that he might be eligible for a modest "good time" reduction of his custodial sentence if he stayed out of trouble during his incarceration.  See id. at 45.

Silveri testified that he reviewed the plea agreement with Medina prior to his plea.  See Tr. of 5/11/06 Conf. at at 42. Silveri translated the agreement into Spanish for Medina and discussed it with him in Spanish.  Id. at 43.  Silveri denied discussing any kind of "side agreement" with Medina.  Id. at 44. Silveri also denied making any promises or threats whatsoever to induce Medina to plead guilty and stated that he told Medina that "the choice was his, he could either go to trial or he could enter a plea."  Id. at 45.

Silveri testified that Medina never indicated that he wanted to go to trial during their discussions before the plea or during the plea proceeding.  Tr. of 5/11/06 Conf. at 43.

---

[8]  During cross-examination, Silveri testified that he had explained to Medina that Rule 35 "was something that occurs after you are sentenced, that if he had information for the government at that time, they probably would listen to him and then decide whether or not they would use it and possibly give him a reduction."  See Tr. of 5/11/06 Conf. at 50.  Silveri testified that he had not discussed any specific reduction with Medina.  Id.

Silveri also denied Medina's allegation that he refused to go to trial without an immediate payment of a trial fee. See id. at 48. When this Court probed further on the issue of the trial fee, Silveri acknowledged that his representation agreement with Medina required a $10,000 trial fee and that he had informed Medina that the fee should be paid in advance of trial. See id. at 53-54. Silveri stated that Medina had advised him that he would have trouble paying this fee. Id. at 54. This Court asked Silveri what he would have done if Medina had stated that he wanted to proceed to trial, but was unable to pay the trial fee. Silveri responded that in such a situation, he would have told Medina that they would proceed to trial since there was no way "this court was going to let me out of doing a trial two weeks before." Id. at 54. When the Government later asked Silveri whether he ever told Medina that he was "refusing to take him to trial if that's what he wanted," the answer was "no." See id. at 55.

Silveri also provided an explanation of his statement toward the conclusion of the plea proceeding that Medina was trying to raise an issue that was most appropriately addressed at sentencing. See Tr. of 5/11/06 Conf. at 45-46. Silveri explained that when he met with Medina before the plea, Medina asked him to request that this Court intervene in the plea negotiation process and secure a lower sentence and also asked

Silveri to bring certain information about Medina's family and medical condition to my attention. Id. at 46. Silveri informed Medina before the plea that these issues should be addressed at sentencing rather than during the plea proceeding. Id.

## Testimony of Benjamin Heinrich

On June 6, 2006, this Court heard the testimony of another attorney, Benjamin Heinrich, who had been hired to give Medina a second opinion on the advisability of entering into the plea agreement. See Tr. of 6/6/06 Conf. at 5-6. Heinrich testified that he met with Medina on one occasion in the courthouse before the plea. Id. at 6. Heinrich testified that in advance of this meeting, he had gathered information about the evidence and charges against Medina by speaking with Silveri and the prosecutor and by reviewing the plea agreement. Id. at 6, 13. During the meeting, Heinrich advised Medina that he could do "no better" in negotiating a plea deal and recommended that he enter into the plea agreement. Id. at 7. Medina told Heinrich that he was going to plead. Id.

Heinrich testified that Medina had not indicated during the meeting that he did not wish to plead guilty and had not expressed any difficulty understanding the terms of the agreement. Tr. of 6/6/06 Conf. at 7. Heinrich also testified that Medina never mentioned a "side agreement" with the Government, and that they had not discussed any sentence other

that the twenty-year sentence specified in the plea agreement. Tr. of 6/6/06 Conf. at 8-10. According to Heinrich, Medina did not express any unhappiness or dissatisfaction with Silveri's representation and was only concerned about whether it was wise to plead guilty under the terms proposed. Id. at 9, 14.

### CONCLUSION

This case has been remanded for the limited purpose of determining whether there is any reason to credit Medina's claims that his attorney coerced or misled him into pleading guilty. While this Court did not find Medina's initial allegations of attorney misconduct at the sentencing conference to be credible, the testimony he gave during the evidentiary hearing confirms that his allegations are false.

Most significantly, the allegations of misconduct Medina asserted during the sentencing conference are dramatically different than those that he testified about during the evidentiary hearing. During the sentencing conference, Medina alleged that Silveri: (1) assured him there was a secret "under the table" agreement with the Government; (2) promised Medina a reduction of his sentence under Rule 35; (3) instructed Medina not to honestly answer this Court's questions during the plea conference; (4) failed to transmit information to the Government that would have helped Medina secure a cooperation agreement; and (5) failed to give him a copy of the plea agreement.

Medina's testimony during the evidentiary hearing included specific denials of some of these prior allegations. For example, Medina denied that he had been concerned about Silveri's failure to transmit information to the Government and testified that Silveri had not instructed him to lie to this Court during the plea conference. See Tr. of 5/11/06 Conf. at 7, 28. When Mr. Angioletti questioned Medina about the secret "under the table" agreement, Medina seemed to have no recollection whatsoever of his previous allegation. See id. at 7. Such inconsistency greatly undermines Medina's credibility.

In addition to contradicting some of his initial allegations, Medina also introduced two completely novel claims of attorney misconduct during the evidentiary hearing. For the first time, Medina claimed that Silveri had "lied" and "cheated" him by promising a five to six year sentence and pressured him into the plea agreement by refusing to bring the case to trial unless Medina immediately paid a trial fee. When questioned by this Court, Medina confirmed that these two allegations were the primary grounds for his claim that Silveri coerced and misled him into pleading guilty. Given the fact that Medina vigorously pressed his allegations against Silveri during the sentencing proceeding, the sudden appearance of these new allegations torpedoes his credibility.

In contrast, this Court found the testimony of both Silveri and Heinrich to be credible. Silveri convincingly denied each of Medina's allegations of misconduct. Furthermore, the testimony of both attorneys supports the conclusion that Medina appreciated the fact that this plea was likely to result in a sentence of twenty years and concluded that such a plea was preferable to the risks of proceeding to trial. Based on all of the testimony received, this Court finds that each of Medina's allegations of attorney misconduct is false and that the plea was entirely knowing and voluntary. This Court therefore reiterates its prior conclusion that no grounds exist for allowing Medina to withdraw his guilty plea.[9] See, e.g., United States v. Torres, 129 F.3d 710, 715 (2d Cir. 1997).

Dated:    New York, New York
          August 24, 2006

                                    NAOMI REICE BUCHWALD
                                    UNITED STATES DISTRICT JUDGE

---

[9] Mindful of the limited scope of this remand, we do not reach the questions of whether Medina's allegations created an actual conflict of interest or whether this conflict adversely affected defense counsel's performance during the sentencing conference. See United States v. Davis, 239 F.3d 283 (2d Cir. 2001); United States v. Moree, 220 F.3d 65 (2d Cir. 2000); United States v. White, 173 F.3d 290 (2d Cir. 1999); Lopez v. Scully, 58 F.3d 38 (2d Cir. 1995).

21

Copies of the foregoing Opinion have been faxed on this
date to the following:

Government
Laurie Korenbaum, Esq.
Elizabeth Maringer, Esq.
Assistant United States Attorney
One Saint Andrew's Plaza
New York, NY 10007


Counsel for Defendant
Paul Angioletti, Esq.
38 Forest Road
Staten Island, NY   10304